FILED
2012 Oct-30  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JACK SHEWMAKE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:09-CV-2208-RDP** |
| | } | |
| **BRYAN ANDERSON, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant's Motion for Summary Judgment (Doc. # 26). The motion has been fully briefed.  (Docs. # 27, 29, 33).

**I.      Background**

Oscar Wilde is credited with the saying, "A man cannot be too careful in his choice of enemies."  Of course, the same can be said of one's selection of business partners.  This case involves a collision between these two otherwise parallel ideals.

Plaintiff Jack Shewmake is an experienced home builder.  (Doc. # 28-1 at 33-34).  He has completed a number of significant developments.  (Doc. # 28-1 at 39-48).  Shewmake met Bryan Anderson ("Anderson") and Derek Weaver ("Weaver") in 2004, when a realtor introduced Anderson and Weaver to Shewmake as "young investors … who wanted to build some houses." (Doc. # 28-1 at 56-57).  Weaver and Anderson were already members of two LLCs, in which Shewmake did not become a member: Blazer Group, LLC ("Blazer Group"); and 360 Properties, LLC ("360 Properties").  (Doc. # 28-1 at 62-63, 78-79).

When Shewmake met Anderson and Weaver, Anderson was an investment counselor or stockbroker with Metropolitan Life.  (Doc. # 28-1 at 57-58).  Anderson and Weaver told Shewmake

that they had invested in the development of an apartment building project in Bessemer and had some real estate experience. (Doc. # 28-1 at 58). Anderson and Weaver were in their thirties and considerably younger than Shewmake. (Doc. # 28-1 at 59-60).

Anderson and Weaver asked Shewmake to build a house for them to sell under a partnership arrangement. (Doc. # 28-1 at 60). Anderson and Weaver purchased two lots in the Chestnut Ridge subdivision through 360 Properties. (Doc. # 28-1 at 61-62). Despite Shewmake's opinion that the lot choices were "terrible," Shewmake entered into a contract with Anderson and Weaver to build the two houses on a fee-basis. He was to receive twenty-five percent of the profit on the sale of the houses. (Doc. # 28-1 at 62-63). Shewmake developed the two homes, which sold in 2005, but Shewmake did not receive any profit on the sales. (Doc. # 28-1 at 64). Shewmake does not know whether Anderson and Weaver made a profit on the two houses. He asked Anderson for information on the sales price on the homes, but Anderson did not provide the information. (Doc. # 28-1 at 64-65).

In early 2005, Shewmake met with Anderson and Weaver several times about a development plan Shewmake had created for a piece of property owned by his father, which ultimately became the Sterling Lakes subdivision. (Doc. # 28-1 at 67-68). On July 28, 2005, Shewmake, Anderson and Weaver formed ASW Development, LLC ("ASW") to develop Sterling Lakes. Anderson and Weaver each received a thirty-three percent interest in the company, and Shewmake received a thirty-four percent interest. (Doc. # 28-1 at 247; Doc. # 28-6 Ex. 34).

Shewmake was to oversee development of the Sterling Lakes property. (Doc. # 28-1 at 68, 246; Doc. # 28-6 Ex. 34). All three members of ASW were to provide an initial contribution of $100,000.00, which none of them ever did. (Doc. # 28-1 at 247-48; Doc. # 28-6 Ex. 34).

The Operating Agreement for ASW provided in relevant part:

> Each member is an agent of the Company for the purpose of its business or affairs, and the act of any Member, including, but not limited to, the execution in the name of the Company of any instrument, for apparently carrying on in the usual way the business or affairs of the Company, binds the Company, unless the Member has no authority to act for the Company in the particular matter and the person with whom the Member is dealing has or should have had knowledge of the fact that the Member has no such authority.

(Doc. # 28-1 at 103, Ex. 6).  The Operating Agreement names Anderson as the President of ASW and Weaver as its Secretary-Treasurer.  (Doc. # 28-3 Ex. 6).  The Operating Agreement further provides:

> 13.2    Vote of Members.  This Agreement may not be amended as to matters which would (i) change adversely any Member's rights and interests in the income, expenses, gains, losses or income tax allocations of the Company, or (ii) change any Member's rights respecting liquidation of the Company without the unanimous affirmative vote of the Members.

(Doc. # 28-3 Ex. 6).

On July 29, 2005, two landowners who owned property adjacent to the property owned by Shewmake's father, Samuel T. Shewmake, conveyed those properties to him.  (Doc. # 28-6 Exs. 31, 32).  The same day, Blazer Group purchased one hundred thirty-seven acres from Samuel T. Shewmake which became the "Sterling Lakes property".  (Doc. # 28-6 Ex. 33).  Shewmake orchestrated this purchase.  (Doc. # 28-1 at 231, 235).

Phase I of Sterling Lakes contained sixty-four lots and had a target date of completion of September 2006.  (Doc. # 28-1 at 95-96).  Although Shewmake did not plan to develop the Sterling Lakes property in phases, he learned that was the plan when he signed loan closing documents at CapitalSouth Bank.  (Doc. # 28-1 at 89-90).

CapitalSouth Bank ("CapitalSouth") is a failed bank that was chartered by the Alabama State Banking Department.  CapitalSouth was declared insolvent on August 29, 2009, and the Federal Deposit Insurance Corporation (the "FDIC") (the remaining Defendant in this case) was appointed Receiver.  (Doc. # 28-10 Ex. E).

CapitalSouth initially declined to finance the Sterling Lakes development because Anderson and Weaver did not have the development experience it was looking for.  Therefore, Anderson and Weaver set up an interview for Shewmake with CapitalSouth.  (Doc. # 28-1 at 72, 311).  At one meeting, David Williamson of CapitalSouth told Shewmake that a condition of CapitalSouth funding the Sterling Lakes project was Shewmake's involvement in it.  (Doc. # 28-1 at 312).

In April 2006, Blazer Group conveyed to ASW a portion of the Sterling Lakes property in exchange for $1,112,341.00.  (Doc. # 28-1 at 256, 259; Doc. # 28-3 Ex. 3; Doc. # 28-6 Ex. 35).  That same day, all three members of ASW executed a number of loan documents.  (Doc. # 28-1 at 83, 134-39, 142-44; Doc. # 28-3 Ex. 7; Doc. # 28-4 Exs. 11, 13 - 15; Doc. # 28-5 Exs. 16 - 18).  They executed an Acquisition and Development Loan Agreement with CapitalSouth for $1,891,000.00 (the "Acquisition Loan").  (Doc. # 28-1 at 83; Doc. # 28-4 Ex. 11).  They also signed a second Acquisition and Development Loan Agreement with CapitalSouth for $1,468,000.00 (the "Second Acquisition Loan").  (Doc. # 28-1 at 138-39; Doc. # 28-5 Ex. 16).

In August 2006, Anderson executed a Commercial Loan Agreement on behalf of ASW, by which ASW borrowed $89,250.00 from CapitalSouth (the "Commercial Loan").  (Doc. # 28-1 at 154, 156; Doc. # 28-5 Exs. 20, 21).  In September 2006, Anderson and Weaver executed a Note Modification Agreement on behalf of ASW increasing the Commercial Loan amount to $579,360.00 (the "Commercial Loan Modification").  (Doc. # 28-1 at 161, Doc. # 28-6 Ex. 23).  Shewmake was

4

asked to sign a $579,000 note and mortgage, but he refused to do so.  (Doc. # 28-1 at 161-62).
Shewmake did not believe the Commercial Loan increase would proceed without his signature,
although no one from CapitalSouth told him that was the case.  (Doc. # 28-1 at 331-32).

In September 2006, Anderson and Weaver signed a Promissory Note on behalf of ASW
pledging repayment of the $579,360.00.  (Doc. # 28-1 at 167-68; Doc. # 28-6 Ex. 25).  Anderson and
Weaver also signed a Mortgage Modification Agreement on behalf of ASW, which increased the
amount of the Acquisition Mortgage from $1,891,000.00 to $2,470,360.00 (the "Mortgage
Modification").  (Doc. # 28-1 at 165-66; Doc. # 28-6 Ex. 24).  Anderson and Weaver also executed
an Accommodation Guaranty on behalf of Blazer Group as further security for the Modified
Commercial Loan.  (Doc. # 28-1 at 173; Doc. # 28-6 Ex. 28).

ASW held a meeting in November 2006, which Shewmake did not attend.  (Doc. # 28-1 at
112-14).  On that date, Anderson and Weaver executed a Resolution which states in part that "Derek
L. Weaver, Member and Bryan W. Anderson, Members of the Company be and are hereby
authorized and directed to do any and all things deemed necessary or advisable and in the best
interests of the Company, at their discretion, in connection with a loan in the amount of $579,360.00
from CapitalSouth to ASW DEVELOPMENT GROUP, L.L.C."  (Doc. # 28-3 Ex. 9).

In December 2006, Anderson and Weaver also executed a Debt Modification Agreement on
behalf of ASW, which stated that the outstanding, unpaid balance of the Commercial Loan was
$184,369.71.  (Doc. # 28-1 at 170-71; Doc. # 28-6 Ex. 26).  Anderson and Weaver also signed a
Commercial Loan Agreement on behalf of ASW, authorizing a single advance of $184,369.71 to be
repaid by February 28, 2007.  (Doc. # 28-1 at 175; Doc. # 28-6 Ex. 29).

Despite Shewmake's understanding that ASW was to develop the entire Sterling Lakes development, Anderson and Weaver developed Phases II and III through the Blazer Group. (Doc. # 28-1 at 198-99, 201-02).

During the development of the Sterling Lakes subdivision, Shewmake believes that Anderson and Weaver made costly decisions and failed to follow through on his advice. ((Doc. # 28-1 at 321-22). Further, over the course of a year, Shewmake asked numerous times for an accounting from Weaver and Anderson, but it was never provided. (Doc. # 28-1 at 116-17, 120, 193-94, 289-91).

At some point, Shewmake suggested that Anderson and Weaver buy out his interest in ASW. (Doc. # 28-1 at 114-15). Anderson offered to buy Shewmake's interest in ASW in exchange for a promissory note in the amount of $400,000.00. (Doc. # 28-1 at 115, 121-23). Shewmake declined the offer. (Doc. # 28-1 at 122).

On or about February 22, 2007, Shewmake filed his original Complaint against Anderson, and Weaver in the Circuit Court of Jefferson County, Bessemer Division, Alabama (the "State Court Action"). (Doc. # 28-6 Ex. 30). Shewmake alleged four causes of action against Weaver and Anderson: fraud, failure to provide an accounting, usurpation of a corporate opportunity, and conversion. (Doc. # 28-6 Ex. 30).

In March 2007, Shewmake asked CapitalSouth employees to show him CapitalSouth statements for ASW. They showed him a loan register with the descending balance which reflected that all loans had been paid in full. (Doc. # 28-1 at 189-92). They refused to show him documents related to the Blazer Group. (Doc. # 28-1 at 189, 192).

In July 2007, CapitolSouth lent money to Blazer Group related to the development of Phase II and III of Sterling Lakes. (Doc. # 30-1 Ex. 3).

On July 31, 2008, Anderson and Weaver filed bankruptcy petitions. (Docs. # 28-8 and 29-9). After that filing, Shewmake received a Quitclaim Deed for all of the Sterling Lakes property to which Blazer Group still had title.  (Doc. # 28-1 at 270-71; Doc. # 28-6 Ex. 38).  Shewmake also received from ASW a deed conveying its remaining interest in the Sterling Lakes property to Shewmake individually.  (Doc. # 28-1 at 97).

On October 3, 2008, Shewmake amended his Complaint in the State Court lawsuit to name CapitalSouth as an additional defendant.  (Doc. # 28-6 Ex. 39).  Shewmake asserts four causes of action against CapitalSouth: conspiracy, breach of fiduciary duty, fraud, and conversion.  (Doc. # 28-6 Ex. 39).  Shewmake asserts that the lot sales in the Fall of 2006 totaled approximately $4,000,000, and that subtracting the Acquisition Loan for $1,891,000, approximately $2,000,000.00 is unaccounted for from the lot sales.  (Doc. # 28-1 at 208, 375).

The FDIC was appointed Receiver of CapitalSouth on August 21, 2009, and succeeded to all rights, titles, powers and privileges of CapitalSouth pursuant to 12 U.S.C. §1821(c)(3)(A).  (Doc. # 28-10 Exs. C and D).  The FDIC removed this case to this court on October 30, 2009.  (Doc. # 1).

## II.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party

7

has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

"To be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 113 (11th Cir. 2010) (citing 10 A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2722, at 382–84 (3d ed.1998)).

## III.    Analysis

After careful review, and for the reasons stated below, the court concludes that Defendant's Motion for Summary Judgment is due to be granted.

### A.    Breach of Fiduciary Duty

Plaintiff's breach of fiduciary duty claim fails as a matter of law. CapitalSouth owed no fiduciary duty to Plaintiff. Under Alabama law, the relationship of a lender to a borrower generally

does not impose a fiduciary duty on the lender. *K & C Dev. Corp. v. AmSouth Bank, N.A.*, 597 So.2d 671, 675 (Ala. 1992) ("Courts have traditionally viewed the relationship between a bank and its customer as a creditor-debtor relationship that does not impose a fiduciary duty on the bank."). This general rule also applies to the relationship between a mortgagee and mortgagor, *Brabham v. Am. Nat'l Bank of Union Springs*, 689 So.2d 82 (Ala.Civ.App. 1996), and where the customer is a depositor. *Baylor v. Jordan*, 445 So.2d 254 (Ala. 1984); *Reynolds v. McEwen*, 416 So.2d 702 (Ala. 1982); *Southern Hardware & Supply Co. v. Lester*, 166 Ala. 86, 52 So. 328 (1910).

"[W]hen a mortgagee forecloses a mortgage pursuant to a power, the mortgagee becomes a trustee of the debtor/mortgagor, and is bound to act in good faith and adopt all reasonable modes of proceeding in order to render the sale most beneficial to the mortgagor." *Wood River Dev., Inc. v. Armbrester*, 547 So.2d 844, 847 (Ala. 1989). A foreclosing mortgagee owes that duty because "the mortgagee is selling the property, and his interest is diametrically opposed to the interest of the mortgagor, especially if he is the purchaser of the property at the foreclosure sale." *Id.* However, even the duty to act in good faith is not a general fiduciary duty. *Brabham*, 689 So.2d at 88.

Plaintiff argues that his or ASW's status as a depositor is enough to give rise to the fiduciary relationship. As discussed above, this argument is without merit. Therefore, because CapitalSouth owed no fiduciary duty to Plaintiff, Defendant is entitled to summary judgment on Plaintiff's breach of fiduciary duty claim.

**B.     Fraud and Deceit**

The elements of fraud are:

(1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation.

9

*Coastal Concrete Co. v. Patterson*, 503 So.2d 824, 826 (Ala. 1987) (citing *Earnest v. Pritchett–Moore, Inc.*, 401 So.2d 752 (Ala. 1981).  The definition of deceit, set forth in Alabama Code § 6-5-104, is:

> (a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.
>
> (b) A deceit within the meaning of this section is either:
>
>> (1) The suggestion as a fact of that which is not true by one who does not believe it to be true;
>>
>> (2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;
>>
>> (3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or
>>
>> (4) A promise made without any intention of performing it.

Ala. Code § 6-5-104.

The problem with Plaintiff's fraud and deceit claim in this case is that it is asserted against the wrong party.  Plaintiff has not alleged any material misrepresentation or suppression made by *CapitalSouth*.  That CapitalSouth required Plaintiff's participation in a project as a condition of financing is neither a misrepresentation, nor a suppression of a material existing fact.  In essence, Plaintiff's fraud and deceit claim is premised on his own understanding (or misunderstanding) of his business relationship with Anderson and Weaver.  But Plaintiff has not alleged any conduct by *CapitalSouth* that led to his (mis)understanding.  The misrepresentations and/or suppressions alleged by Plaintiff, if any, were made by Anderson and Weaver, who are not defendants here.  Therefore, Defendant is entitled to summary judgment on Plaintiff's fraud and deceit claim

C.     Conversion

To establish a claim for conversion, a plaintiff must show "a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has ... the immediate right to possession." *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 863 (11th. Cir. 1984) (quoting *Empiregas, Inc., of Gadsden v. Geary*, 431 So.2d 1258, 1260–61 (Ala. 1983)) (ellipsis in original).  This can be shown through "a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Southtrust Bank v. Donely*, 925 So.2d 934, 939 (Ala. 2005) (quoting *Riscorp, Inc. v. Norman*, 915 So.2d 1142, 1152 (Ala. 2005)).

While conversion has long provided a remedy for the recovery of personal property, its application to money has been "complicated as a result of the evolution of our economic system." *Donely*, 925 So.2d at 940. Originally, the rule was that conversion applied only to tangible physical property, and there "could be no conversion" of money. *Id.* (citing W. Page Keeton et al., *Prossser and Keeton on the Law Of Torts*, § 15, at 91 (5th ed.1984)). The rule was then relaxed to include money that was specifically identifiable, and that could not—by virtue of being in a container of some kind—be intermingled with other funds.  *Id.*

Plaintiff's conversion claim appears to be based on his allegation that the proceeds from the lot sales from Phase I of Sterling Lakes were converted.  Initially problematical is the fact that the funds and property at issue in this case belonged to ASW, not Plaintiff individually.   Nonetheless, Plaintiff claims that the lot sales from Phase I of Sterling Lakes generated approximately $4,000,000. Plaintiff asserts that subtracting the Acquisition Loan for $1,891,000, from $4,000,000 leaves approximately $2,000,000.00 unaccounted for.  (Doc. # 28-1 at 208; Doc. # 28-2 at 375).  Plaintiff

11

appears to claim this amount was converted.  However, Plaintiff's math does not add up.  His calculations—and his arguments premised thereon—fail to take into consideration all of the loans taken out by ASW.

The initial Acquisition Loan was in the amount of $1,891,000.00.  (Doc. # 28-1 at 83; Doc. # 28-4 Ex. 11).  The second Acquisition and Development Loan was in the amount of $1,468,000.00. (Doc. # 28-1 at 138-39; Doc. # 28-5 Ex. 16).  The August 31, 2006, Commercial Loan  was initially in the amount of $89,250.00 (Doc. # 28-1 at 154, 156; Doc. # 28-5 Exs. 20 and 21), but was increased to $579,360.00 in September 2006.  (Doc. # 28-1 at 161; Doc. # 28-6 Ex. 23).  The total of these three loans is slightly more than $4,000,000.  Therefore, if the lot sales indeed generated approximately $4,000,000, then there were no additional funds.  Furthermore, Plaintiff admits he was shown CapitalSouth's records which showed ASW's loans had been paid in full.  Thus, Plaintiff has failed to show that any funds were converted.

To the extent Plaintiff claims that the increase in the Commercial Loan, to which he did not agree, was a conversion, that claim is without merit.  Although taking an unauthorized loan against someone else's property may provide a basis for a conversion claim, the conversion action would lie against the party improperly taking out the loan, not the lender.  *See Crown Life Ins. v. Smith*, 657 So.2d 821, 824 (Ala. 1994).  In other words, CapitalSouth did not exercise improper dominion and control over funds when the allegedly unauthorized loan was taken out.  If anyone was at fault for this allegedly unauthorized loan, it was Anderson and Weaver.  Plaintiff takes issue with the fact that the two other members of ASW, Anderson and Weaver, conducted business on behalf of ASW of which he did not approve.  But again, any claim based upon those facts lies against the individuals requesting the loan, not CapitalSouth.  Furthermore, Plaintiff has not established, within the Rule

12

56 record, even his underlying premise, *i.e.*, that Anderson and Weaver's actions of behalf of ASW were improper. *See* Commentary to *Ala. Code* § 10-12-22 (explaining that the statute adopts a default per capita voting rights rule for Alabama limited liability companies and noting that members can "provide for more detailed rules" in an "operating agreement.").

The record is devoid of any evidence that any funds or property were misapplied or converted. Therefore Defendant is entitled to summary judgment on Plaintiff's conversion claim.

### D.   Conspiracy

"Civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Keith v. Witt Auto Sales, Inc.*, 578 So.2d 1269, 1274 (Ala. 1991) (citing *Eidson v. Olin Corp.*, 527 So.2d 1283 (Ala. 1988)). "The gist of an action alleging civil conspiracy is not the conspiracy itself but, rather, the wrong committed." *Keith*, 578 So.2d at 1274 (citing *Sadie v. Martin*, 468 So.2d 162 (Ala. 1985)).

"It is well established that 'liability for civil conspiracy rests upon the existence of an underlying wrong and [that] if the underlying wrong provides no cause of action, then neither does the conspiracy.'" *Ex parte Alabama Dep't of Transp.*, 764 So.2d 1263, 1271 (Ala. 2000) (quoting *Jones v. BP Oil Co.*, 632 So.2d 435, 439 (Ala. 1993)). "There must be an underlying wrong to support the conspiracy claim." *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So.2d 28, 35 (Ala. 2003). Plaintiff has failed to establish an underlying wrong involving CapitalSouth. Therefore, CapitalSouth is entitled to summary judgment on Plaintiff's conspiracy claim.

## IV.   Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. # 26) is due to be granted. The court will enter a separate order granting the motion.

**DONE** and **ORDERED** this _____30th_____ day of October, 2012.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE